## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TONDALAYA DAVIS**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 2:20-cv-05798-KSM** |
| **ELWYN, INC.** | |
| Defendant. | |

## <u>MEMORANDUM</u>

**MARSTON, J.**                                                    **March 31, 2022**

Plaintiff Tondalaya Davis worked as a Mental Health Program Specialist for Defendant Elwyn.[1]  (Doc. No. 18 at 6.)  In this position, Davis was required to care for "Patient X," a mentally ill patient enrolled in Elwyn's New Beginnings program who purportedly sexually harassed Davis and called her derogatory racial epithets.  (*Id.*)  Davis brings suit against Elwyn, claiming that it subjected her to a hostile work environment by requiring her to care for Patient X in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA").  (*Id.*)  Davis also asserts retaliation claims against Elwyn under the same statutes, alleging that it terminated her because she complained about Patient X's discriminatory and harassing behavior.[2]  (*Id.*)  Presently before the Court is Elwyn's motion for summary judgment.  (Doc. No. 23.)  For the reasons below, Elwyn's motion is granted.

---

[1] Elwyn is incorrectly identified as "Elwyn, Inc." in the caption.

[2] In her complaint, Davis also asserts claims for discrimination under Title VII, Section 1981, and the PHRA (Doc. No. 18), but in her response to Elwyn's motion for summary judgment, she "concedes" that summary judgment is warranted on her discrimination claims.  (*See* Doc. No. 25 at 10.)  Therefore, we do not address her discrimination claims and grant summary judgment to Elwyn on those claims.

## I.      BACKGROUND

### A.      *Factual Background*

Viewing the evidence in the light most favorable to Davis, the relevant facts are as follows.

Elwyn is a nonprofit human services organization that provides a range of programs and services to children and adults with mental, developmental, and physical disabilities.  (Doc. No. 25-1 ¶ 1.)  Elwyn's services include campus-based residential programs.  (*Id.* ¶ 3.)  Elwyn's residential patients suffer from severe behavioral, developmental, and intellectual disabilities, so they require near-constant supervision.  (*Id.* ¶ 4.)  Because its patients require around-the-clock care and supervision, Elwyn staffs its residential programs in three separate shifts, including an overnight shift.  (*Id.* ¶ 5.)

#### 1.      Davis's Employment at Elwyn

Prior to her employment with Elwyn, Davis worked full time as a "psych tech" for Montgomery County Emergency Services.[3]  (*Id.* ¶ 10.)  Montgomery County Emergency Services is a "mental health crisis hospital" that cares for patients going through "emergency mental health crises."  (*Id.* ¶ 11.)  In her role with Montgomery County Emergency Services, Davis monitored patients, assisted with activities of daily living, and assisted with restraints, as needed.  (*Id.* ¶ 12.)  In the fall of 2018, one of Davis's coworkers at Montgomery County Emergency Services informed her that Elwyn was having trouble handling a particular patient (who Davis later learned to be Patient X) and hiring new employees.  (*Id.* ¶ 13; *see also* Doc. No. 23-2 at 51–52.)

---

[3] After beginning her position with Elwyn, Davis stayed on as a "per diem" employee with Montgomery County Emergency Services.  (Doc. No. 23-2 at 65.)  And she is still employed by Montgomery County Emergency Services today.  (Doc. No. 25-1 ¶ 10.)

Davis applied for the position, and in October 2018, she began working as a Mental Health Program Specialist for Elwyn's New Beginnings Program.  (*Id.* ¶ 15.)  The position with Elwyn was largely identical to Davis's role at Montgomery County Emergency Services—she was responsible for assisting patients with activities of daily living, ensuring that patients adhered to individual behavior management plans, preparing behavior and incident reports, and maintaining a clean and orderly facility.  (*Id.* ¶¶ 14, 19.)  Davis generally worked the overnight shift, from 11:00 p.m. to 7:00 a.m.  (*Id.* ¶ 16.)  On the overnight shift, Davis reported to supervisor Adam Moody.  (*Id.* ¶ 18.)  As her supervisor, Moody was responsible for directing Davis to complete job-related tasks and assignments.  (*Id.*; *see also* Doc. No. 23-2 at 145 (Davis testifying that "Mr. Moody, as [her] supervisor . . . had the ability to tell [her] to complete . . . task[s]").

## 2.      The New Beginnings Program

Elwyn's New Beginnings program offers long-term residential care for mentally ill patients.  (*Id.* ¶ 23.)  The program is a "step-down" program, meaning that it provides care for patients who had previously been involuntarily institutionalized at Norristown State Hospital.  (*Id.* ¶¶ 23, 25.)  Patients were typically enrolled in the program for twelve to twenty-four months as they transitioned back into the community.  (Doc. No. 25-2 at 20.)  Many of the patients in the New Beginnings program have behavioral problems, "very poor social skills," and "don't necessarily understand social skills in the same way" as others.  (Doc. No. 25-1 ¶ 24.)  The aim of the program is to "get patients that [had] previously been in the state hospital . . . re-acclimated to the community, . . . to help them with that transition in any way possible."  (*Id.* ¶ 26.)  New Beginnings is a hands-off program, so staff could not physically restrain patients (*id.* ¶ 23), but the facility was a "locked down" facility, so points of ingress and egress were always locked, and the facility's common areas were under 24-hour video surveillance (*id.* ¶ 31).

Each patient in the New Beginnings program had an individualized behavioral plan that identified their challenging or problematic behaviors and prescribed a course of best action to help the residents transition back to the community.  (*Id.* ¶ 27.)  The behavioral plans also included steps staff could take to respond to inappropriate or negative behaviors the patient may exhibit.  (*Id.* ¶ 29.)

### 3.    Patient X

From the beginning of her employment, Davis had issues with Patient X, a patient in the New Beginnings program who had previously been institutionalized at Norristown State Hospital.  (*Id.* ¶ 32.)  Patient X has diagnoses of mood disorder, impulse control disorder, and borderline personality disorder.  (Doc. No. 29-3 at 2.)  Patient X routinely called Davis, an African American woman, derogatory slurs such as "orangutan," "n----- bitch," and "the Help." (Doc. No. 25-1 ¶ 33.)  Patient X directed similar slurs to other African American staff members and "would call some of the white staff members or the white residents spics or hicks."  (Doc. No. 25-2 at 38.)  Patient X also engaged in sexually inappropriate behavior:  "He would tell the staff that they could suck his dick.  He would pull down his pants on purpose.  He would urinate on purpose."  (*Id.* at 43.)

One instance in particular stuck with Davis.  One day in the summer of 2018, Davis wore a white T-shirt to work.  (Doc. No. 23-2 at 117.)  Patient X said he was "going to make it a wet T-shirt contest," poured water down her T-shirt, and placed the water bottle on her chest.  (*Id.*) The police were called in response to this and another incident (that happened the same day) in which Patient X "was very aggressive towards another female staff member and attempted to rip her shirt."[4]  (*Id.*)

---

[4] Elwyn staff called police multiple times on Patient X "when [they] couldn't handle him."  (Doc. No. 23-2 at 133.)  This happened more than five (but fewer than ten) times in Davis's tenure at Elwyn,

When Patient X acted out, Davis and her co-workers asked their supervisors for "support and guidance on how [they were] supposed to deal with these things." (*Id.* ¶ 35.)  The supervisors underscored Elwyn's policies, which outline procedures for reporting behavioral incidents, and instructed staff to have another employee step in when Patient X began directing problematic behavior at anyone in particular. (*Id.* ¶ 36; *see also* Doc. No. 23-2 at 107.)  Elwyn staff also updated Patient X's behavioral treatment plan in an attempt to minimize his problematic behaviors. (Doc. No. 25-1 ¶ 37.)  Davis acknowledges that Elwyn made these changes but complains that management "would not provide the support required."[5] (*Id.* ¶ 35.) Additionally, due to Patient X's near-constant behavioral issues, Davis's notes on Patient X's behavior did not always include "every little detail." (*See* Doc. No. 23-2 at 157 (Davis testifying that she "did not always put in the things that he would say that were derogatory because they were, basically, a given").)  Davis believes that Patient X should have been involuntarily committed, or "302'd," but was not because other facilities were unwilling to accept him given his history.[6] (Doc. No. 25-1 ¶ 33.)

---

but Patient X was never "302'd," or involuntarily committed, as a result of those calls. (*See id.* at 132–33 (Davis testifying that Elwyn staff had to call the police on Patient X repeatedly from the time she began her position through her termination); *see also* Doc. No. 25-2 at 47 (Mack testifying that the police were called on Patient X "many times," that "just about every staff member . . . called the cops on Patient X," and that the police "were fed up with [Elwyn] calling them, stating that, that it's a program that . . . should be able to deal with his behaviors").)

[5] Davis also states that another staff member, James Reid, was terminated for complaining about Patient X's behavior (Doc. No. 25-1 ¶ 35); however, the record evidence shows that Reid was terminated after body slamming Patient X in violation of Elwyn's policies (Doc. No. 23-2 at 135).

[6] Similarly, supervisor Jamal Mack testified that Norristown State Hospital was unwilling to admit Patient X:

> It was to the point that, when we called the cops [on Patient X], there were times when Norristown State Hospital did not even admit Patient X, because they already knew that it was behavioral, and it was—you know, there were times when it was, like, this is your client, y'all should be able to deal with him.

### 4.      Davis's Reported Attitude Issues

Less than a year into her tenure at Elwyn, Davis was written up for having a bad attitude at a training presentation.  In April 2019, an outside expert gave Elwyn staff a training on best practices for handling patients in a transitionary facility like Elwyn.  (Doc. No. 23-2 at 146.)  The speaker instructed the staff not to "wait[] on . . . residents hand and foot" but instead to "teach them and encourage them to do these things on their own."  (*Id.*)  At this training, Davis accused the presenter of being unclear and making contradictory statements.  (Doc. No. 25-1 ¶ 20.)  She later received a verbal warning for being argumentative and challenging the presenter and was informed that her conduct "did not represent New Beginnings well."  (Doc. No. 23-2 at 277.)  Davis explained that she had not intended to challenge the presenter but "wanted to be a part of the conversation in the room."  (*Id.*)  In an email memorializing the conversation, supervisor Jamal Mack noted, "It is with hopes that our discussion was received well and she will change her mindset as an Elwyn employee."  (*Id.*)

### 5.      The June 18, 2019 Incident and Davis's Eventual Termination

Davis worked the overnight shift (from 11:00 p.m. to 7:00 a.m.) in the early hours of June 18, 2019.  (Doc. No. 25-1 ¶ 39.)  Around 1:20 a.m., Patient X came out of his room and informed Davis that he had urinated on both sides of his mattress.  (*Id.* ¶ 31.)  He asked to sleep on a sofa in the common area since his bed was wet, and Davis said that he had to get permission from Moody, Davis's supervisor.  (*Id.* ¶¶ 41–42.)  Moody told Patient X that he could not sleep in the common area, so Patient X went back to Davis for assistance cleaning up his bed.  (*Id.* ¶ 43.)  Davis brought a fitted, waterproof sheet to Patient X's room and instructed him to make the bed with the new sheet.  (*Id.* ¶ 44.)  Patient X refused.  (*Id.* ¶ 45.)  Davis insisted that she

---

(Doc. No. 25-3 at 25–26.)

would *help* Patient X make the bed but would not do it for him.[7]  (*Id.*)  Patient X grew frustrated, and Davis left the room.  (*Id.* ¶ 46.)

Davis asked Moody how to proceed, and he instructed her to return to Patient X's room and put the waterproof sheet on the bed.  (*Id.*)  Moody explained his rationale—he was trying to deescalate the situation; he told Davis "that there was no need to debate with Patient X about his abilities and that she should just help him to change his bed and Patient X would go back to bed and [she] would have diffused a potential negative situation by simply offering support."  (Doc. No. 23-2 at 451.)  When Davis returned to his room, Patient X was visibly upset; he continued to refuse to help make the bed, called Davis "n----- maid," and threatened to get her fired if she continued not to help.  (*Id.*)  Because she believed that Patient X did not respect women, Davis left again to get assistance from a male co-worker, but Patient X followed her out of the room and continued to curse at her.  (*Id.*)  Growing increasingly uncomfortable, Davis went back to Moody.  (*Id.*)  He told her, "T, you're making this into a thing.  Don't make it into a thing; just do it."  (*Id.*)  Davis refused to go back to Patient X's room and suggested that another Patient Specialist help him instead.  (*Id.*)  Moody told Davis that she could either help Patient X or go home.  (*Id.*)  Davis said, "I'm going home."  (*Id.*)

The following day, Moody reported the incident to his supervisors and recommended that Davis be terminated for insubordination.[8]  (*Id.* ¶ 54.)  While Moody's request to terminate Davis was pending, Davis continued to work for Elwyn and report to Moody.  (*Id.* ¶ 56.)  A few weeks

---

[7] Davis believed that she should not make the bed for Patient X because he was capable of doing so himself, and she was trained not to wait on patients hand and foot in order to "make the patients as self-sufficient and independent as possible to allow them to return to society."  (Doc. No. 25 at 12.)

[8] Davis separately recounted the incident for Mack.  (Doc. No. 23-2 at 453.)  She explained that she was happy to assist but was unwilling to make the bed for Patient X.  However, she did not note that Patient X was acting belligerently, nor did she note that she refused to make the bed in order to teach Patient X basic life skills as she had learned in the April 2019 training.  (*Id.*)

after the incident, Davis called Elwyn's Compliance Hotline and reported that Moody was giving her more work than her co-workers and nitpicking her performance.  (*Id.* .)  Davis believes that Moody was scrutinizing her work because she had refused to make Patient X's bed for him.  (*Id.*)

Ultimately, on August 1, 2019 Davis was terminated because her refusal to abide by her supervisor's instruction and assist Patient X on June 18 violated Elwyn Discipline Policy No. 204.[9]  (*Id.* ¶ 55; *see also* Doc. No. 23-2 (Elwyn Discipline Policy No. 204 listing "[r]efusal to carry out a directive from a manager or supervisor" constituted a "substantiated offense" that could result in discharge).)  Davis attempted to appeal her termination, but the termination was upheld.  (Doc. No. 25-1 ¶ 55.)

### B.    Procedural History

Davis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission on January 22, 2020 and received a right-to-sue letter from the EEOC on August 24, 2020.  (Doc. No. 18 ¶ 4.) Davis initiated this action on November 19, 2020.  (Doc. No. 1.)  Davis filed an amended complaint, adding a claim under the PHRA, on June 11, 2021.  (Doc. No. 18.)

Following a period of discovery, Elwyn moved for summary judgment on all claims.[10] (Doc. No. 23.)  Elwyn argues that any hostility Davis may have faced came from Patient X, not any of Elwyn's staff, and that Davis was terminated for a legitimate reason, her refusal to assist Patient X.  (Doc. No. 23-4 at 1–2.)  Davis opposes the motion for summary judgment and argues

---

[9] Although Moody recommended that Davis be terminated on June 19, 2019, the day after the incident and her termination letter was dated June 25, 2019, she was not actually terminated until August 1, 2019, when management ultimately approved the termination.  (Doc. No. 23-2 at 324.)

[10] Elwyn filed a statement of undisputed facts in connection with its motion for summary judgment; however, the version it filed on August 6, 2021 contained tracked changes.  (*See* Doc. No. 23-3.)  Elwyn corrected this error and filed a clean, but otherwise identical, statement of undisputed facts on August 21, 2021.  (Doc. No. 26.)  The Court has relied on the corrected version of Elwyn's statement of undisputed facts.

that there is a genuine dispute of material fact about whether she faced a hostile work environment and whether she was terminated for complaining about Patient X's discriminatory and harassing comments.[11]  (Doc. No. 25 at 5, 10.)

## II.     LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "[T]he inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

## III.    DISCUSSION

Davis brings claims under Title VII, Section 1981, and the PHRA, arguing that she was

---

[11] The Court is disappointed in the quality of the briefing.  In Elwyn's brief in support of its motion for summary judgment, Elwyn does not analogize to a single case and only cites to case law in setting forth the legal standard.  (*See generally* Doc. No. 23-4.)  Similarly, Davis fails to cite a single analogous case in her response brief (again, other than in setting forth the legal framework).  (*See generally* Doc. No. 25.)

subjected to a hostile work environment on the basis of her sex, that she was subjected to a hostile work environment on the basis of her race, and that she was terminated in retaliation for complaining about Patient X's discriminatory and harassing behavior.  (Doc. No. 18.)  Title VII, Section 1981, and the PHRA are subject to the same legal standard, so the Court will analyze them together.  *See Greer v. Mondelez Glob.*, 590 F. App'x 170, 172 n.4 (3d Cir. 2014) (explaining that "the substantive elements of an employment discrimination claim brought under § 1981 are identical to those brought under Title VII" (citations omitted)); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (citing *Kelly v. Drexel Univ.*, 94 F. 3d 102, 105 (3d Cir. 1996))).

### A.    Hostile Work Environment

Davis claims that she was subjected to a hostile work environment because Patient X repeatedly made discriminatory and harassing comments to her.  (Doc. No. 25 at 5.)  To establish a hostile work environment claim, a plaintiff must show (1) that she suffered intentional discrimination because of her race and/or sex; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability.  *Minarsky v. Susquehanna County*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  To survive summary judgment on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (cleaned up).

Elwyn argues that Davis has failed to establish a hostile work environment claim because Elwyn is not liable for the acts of Patient X.[12]  (Doc. No. 23-4 at 5.)  However, before considering whether Elwyn can be held liable for Patient X's acts under a theory of *respondeat superior*, the Court first considers, *sua sponte*, whether Patient X's discrimination would detrimentally affect a reasonable person in like circumstances.

### 1.    Patient X's Conduct Would Not Detrimentally Affect a Reasonable Person in the Same Circumstances

Even viewing the evidence in the light most favorable to Davis, the Court finds that a reasonable person in the same circumstances would not have been detrimentally affected by Patient X's conduct.  To survive summary judgment, Davis must show that Patient X's behavior created an *objectively* hostile work environment.  *Minarsky*, 895 F.3d at 310.  In considering whether claimed conduct would have created an objectively hostile work environment, a court must evaluate "the totality of the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Lucas v. City of Philadelphia*, Civil Action No. 11–4376, 2013 WL 2156007, at *16 (E.D. Pa. 2013) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001)).

The Court considers whether Patient X's conduct would have detrimentally affected a reasonable person in the same circumstances in connection with Davis's rase- and sex-based

---

[12] For the first time in its reply brief, Elwyn also argues that Davis's hostile work environment claim fails because Patient X was an "equal opportunity harasser," so any harassing statements from him were not motivated by the discriminatory animus.  (Doc. No. 29 at 5–6.)  However, because Elwyn first raised this argument in its reply brief, we will not consider it at this stage.  *Lett v. Se. Pa. Transp. Auth.*, CIVIL ACTION NO. 19-3170-KSM, 2020 WL 12702548, at *2 n.2 (E.D. Pa. June 11, 2020) (refusing to consider an argument raised for the first time in the defendant's amended reply brief).

claims in turn.

             **i.**        <u>**Race**</u>

Davis claims that she was subjected to a hostile work environment due to Patient X's racial harassment.  (Doc. No. 18 at 11.)  Davis has not identified any specific instances in which Patient X discriminated against her on the basis of her race; however, she has testified that Patient X "would always make racial slurs" and would call the staff derogatory terms "all the time."  (Doc. No. 23-2 at 103; *see also id.* (Davis testifying that there were "so many instances" of Patient X making derogatory slurs "running through [her] head").)  Although courts in this Circuit decline to consider unsubstantiated allegations that the allegedly discriminatory conduct occurred "all the time," *see Nitkin v. Main Line Health*, CIVIL ACTION NO. 20-4825, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021) (collecting cases), other evidence in the record corroborates that Patient X regularly used racial slurs.  For instance, Mack's testimony confirms that Patient X used racial epithets in reference to Davis and other African American staff members and also used different (but also derogatory) slurs to Caucasian staff members.  (Doc. No. 25-2 at 38.)

Although repeated racial slurs could certainly detrimentally affect a reasonable person in *many contexts*, the Court finds that a reasonable person would not have been affected by Patient X's conduct in *this specific context*.  Many courts have held that caregivers at psychiatric institutes are not subjected to a hostile work environment simply because a mentally ill patient in their care makes derogatory comments.  *See, e.g.*, *Matu-Dadie v. Wernersville State Hosp.*, No. 5:17-cv-05451, 2018 WL 4501538, at *4 (E.D. Pa. Sept. 20, 2018) (holding that a reasonable aide at an inpatient facility that served individuals with mental illnesses would not have been detrimentally affected by a patient's use of the "'N' word" or "I don't like black people"); *Blethen v. MaineGeneral Rehab. & Nursing Care*, No. 1:11–cv–00277–DBH, 2012 WL

4325824, at *19 (D. Me. Aug. 1, 2012) ("From an objective standpoint, the offensive remarks attributed to [two patients in a care facility] may well have been more than mere offensive utterances if spoken by co-workers and supervisors, but they did not reasonably give rise to an objectively hostile or abusive work environment under the circumstances because the record demonstrates that [the patients] were elderly, dependent residents at Gray Birch, whose unfortunate attitudes did not present a threat or other significant obstacle to Blethen and whose statements are therefore objectively on the level of mere offensive utterances."); *Pickett v. Sheridan Health Care Ctr.*, No. 07 C 1722, 2008 WL 719224, at *4 (N.D. Ill. Mar. 14, 2008) (granting the defendant–nursing home's motion for summary judgment where the plaintiff brought a hostile work environment claim based on verbal threats from a mentally ill patient). For instance, in *EEOC v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351 (5th Cir. 2006), the plaintiff cared for elderly patients suffering from dementia, schizophrenia, and Alzheimer's disease. *Id.* at 352. One patient made offensive racial comments on a near daily basis over the course of several months. *Id.* The Fifth Circuit acknowledged that these statements may have been severe or pervasive in certain contexts but held that they did not support the plaintiff's claim for hostile work environment because the patient's comments "were not so frequent to pervade the work experience of a reasonable nursing home employee, especially considering their source." *Id.* at 353. The court explained that the plaintiff's "line of employment [was] a vital consideration." *Id.* at 354. His job required him to deal with elderly people whose "minds have essentially failed," and "[a]bsorbing occasional verbal abuse from such patients was . . . an important part of the job itself." *Id.*

The same is true here. Patient X is a severely mentally ill patient who has been receiving care in locked down psychiatric institutes for years. (Doc. No. 25-1 ¶ 32.) And Davis was a caregiver tasked with helping Patient X and other severely mentally ill patients as they attempted

to make the transition from involuntary institutionalization to the community.  (*Id.* ¶ 14.)  When Davis accepted the role, she knew there were challenging patients and was aware that Elwyn "was having trouble handling a particular patient."  (*Id.* ¶ 13.)  Although the Court acknowledges Patient X's racial slurs are appalling, the Court finds that an objectively reasonable caretaker in this particular setting (i.e. a locked down psychiatric institute) would not have been detrimentally affected by Patient X's race-based comments.

### ii.    <u>Sex</u>

Davis also claims that she was subjected to a hostile work environment on the basis of her sex.  (Doc. No. 18 at 8.)  Specifically, she claims that Patient X sexually harassed her when he poured water down her white T-shirt and pressed the water bottle against her chest in what he described as a "wet T-shirt" contest (the "Water Bottle Incident").  (Doc. No. 25 at 8.)  Davis also claims that Patient X "would pull his pants down and ask if [Davis] wanted to suck his dick."  (Doc. No. 25-1 ¶ 33.)  Davis does not identify any record evidence supporting the assertion that Patient X made such comments to Davis in particular, and Mack testified that Patient X "would tell the staff that they could suck his dick," "would pull down his pants on purpose," and "would urinate on purpose" and ask the staff—including Davis—to "clean him up."  (Doc. No. 25-2 at 43.)

Although these statements and the Water Bottle Incident are unquestionably vulgar, they also must be considered in the specific context of a locked down psychiatric institute.  Patient X is mentally ill and unable to control his emotions, so he acts out when he does not get his way. (Doc. No. 25-1 at 33.)  An objectively reasonable person would not have taken these statements or the Water Bottle Incident as anything more than offensive actions and comments from a severely mentally ill patient; they were not harassing or threatening, and unfortunately, it is not

unexpected that a patient at a psychiatric care facility would engage in such behavior.[13]  *See Pickett*, 2008 WL 719224, at \*4 (granting the defendant–nursing home's motion for summary judgment where the plaintiff brought a hostile work environment claim based on unwanted touching from a mentally ill patient); *cf. Matu-Dadie*, 2018 WL 4501538, at \*4; *Blethen*, 2012 WL 4325824, at \*19.

\* \* \*

This is not a case where a supervisor or co-worker hurled racial slurs at or made sexual advances toward an employee; it is a case where a mentally ill and behaviorally disturbed patient was unable to express himself and routinely made inappropriate comments to almost all of his caregivers and many other patients.  The Court acknowledges that Davis may have been uncomfortable caring for Patient X, but unfortunately his behavior is par for the course at psychiatric care facilities like Elwyn.  Accordingly, the Court finds that Davis has failed to state a claim for hostile work environment on the basis of race or sex.

## 2.    *Respondeat Superior*

Further, even assuming *arguendo* that Patient X subjected Davis to a hostile work environment, Davis's hostile work environment claims nevertheless fail because Elwyn cannot be held liable for Patient X's actions.  An employer may be liable for a non-employee's actions "where the employer . . . knows or should have known of the conduct and fails to take immediate and appropriate corrective action."  *Hewitt v. BS Transp. of Ill., LLC*, 355 F. Supp. 3d 227, 230 (E.D. Pa. 2019) (quoting *Johnson-Harris v. AmQuip Cranes Rental, LLC*, No. 14-767, 2015 WL 4113542, at \*8 (E.D. Pa. July 8, 2015)).  The parties agree that Elwyn was aware of Patient X's

---

[13] Viewing all the record evidence, including the video footage of the Water Bottle Incident, the Court cannot conclude that Davis has state a hostile work environment claim based on the Water Bottle Incident.  (*See* Doc. No. 29, Ex. P.)

problematic behavioral but dispute whether Elwyn took "immediate and appropriate corrective action." (Doc. No. 23-4 at 5–6.) Elwyn argues that its hands were tied—it "could not terminate, suspend or discipline Patient X for his behavior caused by his mental illness," and that it used "all the tools at its disposal to address Patient X's behavioral problems within the parameters of the program." (*Id.* at 6.) Davis counters that there is a factual dispute as to whether Elwyn's response was sufficient and suggests that Elwyn should have done more to protect its employees, including terminating Patient X's residency.[14] (Doc. No. 25 at 7–8.)

The Court finds that Elwyn took "immediate and appropriate corrective action" to address Patient X's behavioral issues given the circumstances. Patient X was a mentally ill patient in Elwyn's care. When Patient X had behavioral outbursts, Elwyn changed its treatment strategy in hopes that his behavior would improve and offered its staff strategies for how to respond in the event of such outbursts. (Doc. No. 25-1 ¶¶ 37–38; *see also* Doc. No. 23-2 at 219–20 (Davis detailing conversations she had with Mack and other supervisors about "ways [she] could diffuse the situation" with Patient X).) Davis suggests that Elwyn should have taken alternative actions, but the actions she proposes would have been ineffective or far too harsh to be considered "appropriate." For instance, reassigning Davis away from Patient X may have prevented Davis from Patient X's hostility, but Patient X was known for making similarly inappropriate comments towards essentially everyone on the New Beginnings staff, (*see* Doc. No. 25-2 at 38 (Mack testifying about how Patient X made derogatory comments to the staff generally, not just Davis)), and it would have been impossible to reassign everyone who cared

---

[14] Davis also argues that Patient X was improperly enrolled in New Beginnings because he did "did not suffer from any mental diagnoses" (Doc. No. 25 at 7); however, the record evidence, including Patient X's medical chart, shows that Patient X suffers from several mental illnesses, including mood disorder, impulse control disorder, and borderline personality disorder (Doc. No. 29-3 at 2).

for Patient X.[15]  Similarly, the suggestion that Elwyn should have terminated Patient X's residency is disproportionate to Patient X's alleged harassing conduct.  Patient X suffered from a litany of mental illnesses, had been enrolled at Elwyn for some time, and had previously been involuntarily institutionalized at Norristown State Hospital.  In fact, Davis has conceded that other institutions "would not accept Patient X" (*see* Doc. No. 25-1 ¶ 33), so it is unlikely that any care facility would have taken in Patient X had his residency been terminated.  He was certainly not fit to be on his own, and the thought that a mentally ill patient with *behavioral issues* should be removed from a locked down psychiatric care facility because he exhibited the very *behavioral issues* for which he was receiving treatment is unreasonable and certainly not required by federal and state employment laws.

Elwyn took timely and appropriate steps to protect its employees from Patient X's actions in the manner it thought most appropriate under the circumstances, and the Court declines to second guess the course of action Elwyn's professionals prescribed to treat Patient X.  In fact, other courts presented with similar cases have held that defendant–care facilities that took similar or less action were not liable for their patients' allegedly harassing conduct.  *See Matu-Dadie*, 2018 WL 4501538, at *5 (holding that an inpatient facility was not liable for the acts of its patient even though the facility did not take *any* remedial action against the problematic patient because "absorbing occasional verbal abuse from mental health patients was not merely an inconvenience associated with her job; it was an important part of the job itself"); *Pickett*, 2008 WL 719224, at *4 (holding that a defendant–nursing home took appropriate and immediate action and thus was not liable for patient's acts where it counseled the patient about his alleged

---

[15] Ironically, at the time she applied for the position with New Beginnings, Davis was aware that Elwyn was hiring because it "was having trouble handling a particular patient"—i.e., Patient X.  (Doc. No. 25-1 ¶ 13.)

inappropriate behavior and placed him on a monitoring program); *cf. Lidwell v. Univ. Park Nursing Care Ctr.*, 116 F. Supp. 2d 571, 582 (M.D. Pa. 2000) (holding that an employer took immediate and appropriate corrective action in response to alleged harassing behavior by non-employees where it conducted an investigation and spoke to the non-employees about their conduct).

Because Elwyn took immediate and appropriate action, it cannot be held liable for Patient X's conduct.

\*      \*      \*

Patient X is mentally ill and unable to control his behaviors.  His comments and actions were not so severe that an objectively reasonable caretaker in Davis's position would have found them hostile, and even if they had been so severe, Elwyn took appropriate steps to address Patient X's behavior, so they cannot be held liable for his conduct.  Accordingly, the Court grants summary judgment for Elwyn on the hostile work environment claims.

### B.     Retaliation

Davis claims that she was retaliated against because she reported Patient X's discriminatory and harassing conduct.  (Doc. No. 18 ¶ 49.)

The *McDonnell Douglas* burden shifting framework applies to Davis's retaliation claim. First, Davis must establish a prima facie case of retaliation.  *See Moore v. City of Philadelphia*, 461 F.3d 331, 341–42 (3d Cir. 2006).  If she can do so, the burden shifts to Elwyn to establish a legitimate, non-retaliatory reason for her termination.  *Id.*  The burden then shifts back to Davis to show that Elwyn's stated reason is pretextual.  *Id.*

### 1.     Prima Facie Case

To establish a prima facie case of retaliation, Davis must present evidence that "(1) she engaged in protected activity protected by Title VII; (2) the employer took an adverse

employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Id.* (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  It is undisputed that Davis suffered an adverse employment action when she was terminated.  However, Elwyn argues that Davis's retaliation claim must fail because she has not presented any evidence that she engaged in protected activity or that her engagement in any such activity was the but-for cause of her termination.  (Doc. No. 23-4 at 9.)

### i.   Protected Activity

Title VII protects employees who oppose unlawful discrimination.  *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006).  "[T]he employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  *Moore*, 461 F.3d at 341 (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)).  Put differently, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected."  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008).

Davis claims that she engaged in protected activity by reporting Patient X's discriminatory and sexually harassing behaviors.  (Doc. No. 18 ¶ 49; Doc. No. 25 at 13.)  An employee's right to report discrimination and/or harassment is protected activity.  *See, e.g. Kengerski v. Harper*, 6 F.4th 531, 537 (3d Cir. 2021) (holding that an employee engaged in protected activity when he reported discriminatory comments a coworker made regarding his biracial granddaughter); *Hernandez v. EHC Assocs., Inc.*, No. 5:17-cv-05263, 2018 WL 5870319, at *3 (E.D. Pa. Nov. 9, 2018) (holding that an employee engaged in protected activity when she reported a co-worker's harassing behavior to a supervisor).

Viewing the facts in the light most favorable to Davis, the Court finds that an objectively

reasonable caretaker could have thought Patient X's repeated racial slurs and sexually harassing conduct was unlawful under Title VII. Accordingly, the Court finds that, at this stage, Davis has satisfied her burden of showing that she engaged in protected activity when she reported Patient X's discriminatory and harassing conduct. *See Cain v. Blackwell*, 246 F.3d 758, 761 (5th Cir. 2001) (holding that a home health aide engaged in protected activity when she complained about a patient's discriminatory comments); *Blethen*, 2012 WL 4325824, at *24 (acknowledging that reporting a patient's inappropriate comments could constitute protected activity); *Pickett*, 2008 WL 719224, at *5 (same).

### ii.   Causal Connection

To establish a prima facie case of retaliation, Davis must also demonstrate a causal connection between her complaints about Patient X's behavior and her termination. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. Se. Pa. Transp. Auth.*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015).

Davis complained about Patient X's discriminatory and harassing conduct to her supervisor Moody on June 18, and Moody recommended terminating her the *very next day*. (Doc. No. 25-1 ¶¶ 46, 54.) This temporal proximity supports a finding that Davis was terminated because she complained about Patient X.[16] *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691

---

[16] Although Davis was not officially terminated for approximately six weeks later, the Court finds that Moody began the process of terminating Davis the day after she engaged in protected activity. As such, this timing is unusually suggestive of a causal link. *See Roddy v. Winter*, Civil Action No. 1:06-CV-1279, 2008 WL 4372818, at *1 (M.D. Pa. Sept. 19, 2008) (finding unusually suggestive temporal proximity to support a causal link where a supervisor suggested the plaintiff be terminated the same week she filed an EEOC charge).

F.3d 294, 307 (3d Cir. 2012) (holding that the temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity); *Stocker v. Green, Tweed & Co.*, Civil Action No. 18-4503, 2020 WL 4437113, at *16 (E.D. Pa. Aug. 3, 2020) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, the temporal proximity in this case [one week] is in the realm of what this Court and others have found sufficient at the prima facie stage.").

* * *

The Court finds that Davis has stated a prima facie case of retaliation—she engaged in protected activity by reporting Patient X's purportedly discriminatory and harassing conduct, she was terminated, and her supervisor initiated the termination process the day after she reported Patient X's conduct.

### 2. Legitimate, Non-Discriminatory Reason

The burden now shifts to Elwyn to prove it had a legitimate, non-discriminatory reason for terminating Davis. Elwyn has satisfied its burden here. Elwyn claims that Davis was terminated for her refusal to help Patient X put sheets on his soiled bed in the middle of the night despite direct orders from Moody, her supervisor, to do so. (Doc. No. 25-1 ¶ 53; *see also* Doc. No. 23-2 at 451 (email from Moody recounting June 18 incident and stating that "Tondalaya [Davis] was sent home last night for refusing to offer assistance to [Patient X] after being asked repeatedly to do so by Shift supervisor").) Elwyn's Discipline Policy No. 204 provides that "[r]efusal to carry out a directive from a manager or supervisor" is a "major offense which will result in either a final written warning or discharge." (Doc. No. 23-2 at 457.) Since Davis committed a terminable offense, the Court finds that Elwyn has shown it had a legitimate, non-discriminatory reason for terminating Davis. *See Branch v. Temple Univ.*, --- F. Supp. 3d ---, CIVIL ACTION No. 20-2323, 2021 WL 3562851, at *11 (E.D. Pa. Aug. 12, 2021) (concluding

that the defendants articulated a legitimate, nondiscriminatory reason for terminating the plaintiff where the plaintiff failed to sign a log book in violation of the defendant's "Work Rules").

### 3.    Pretext

Last, the burden shifts back to Davis to show that the reasons Elwyn articulated for her termination were merely a pretext for retaliation.  "Pretext may be shown by exposing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007) (cleaned up).  "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully retaliated."  *Id.* (quoting *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005)).  "[A]t the pretext stage it is not a court's role to rule on the strength of cause for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015).

Davis argues at the highest level that "there is evidence of pretext" (Doc. No. 25 at 10), but she does not identify any such evidence or otherwise explain to the Court what this pretext is. Davis does, however, make much ado about the fact that Elwyn encourages its staff "to assist the patient, not actually do the task," and argues that, accordingly, she was not required to make Patient X's bed for him.  (*Id.* at 12; *see also id.* ("[Elwyn's] mission was to make the patients as self-sufficient and independent as possible to allow them to return to society.").)  Davis may be suggesting that there are inconsistencies with Elwyn's stated reason for terminating her because she was simply following this directive when she refused to make Patient X's bed for him.  (*See* Doc. No. 25-1 ¶ 46 ("Plaintiff informed Mr. Moody that she had no problem assisting Patient X

in making the bed, but that she could not just do it for him.").)

But this argument fails to demonstrate any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Elwyn's proffered reason for terminating Davis for several reasons.

First, even viewing the record in the light most favorable to Davis, there is no evidence that Elwyn had a formal policy that its staff was *never* supposed to do anything for its patients. At a training in April 2019, Davis and other Elwyn staff were encouraged to "not necessarily wait[] on residents hand and foot" and instead, to "be[] part of them having a quality life." ((Doc. No. 23-2 at 146–47.)  The Court acknowledges that, as a step-down facility that helps patients transition from institutionalization to the community, it is likely that Elwyn would have trained its staff to encourage patients to take ownership of certain day-to-day activities, such as changing bedding.  But the patients in Elwyn's New Beginnings program were still incredibly vulnerable patients making the difficult transition into the community and required around-the-clock care in a locked down facility.  No reasonable juror could find that Elwyn's policy of encouraging patients to care for themselves required Davis not to help Patient X after he soiled both sides of his bed in the wee hours of the morning.  This is especially so given her supervisor's admonishment to make up the bed for Patient X and to attempt to keep the situation deescalated given the known difficulties with this particular patient.

Further, Davis's own actions belie the argument that she was abiding by Elwyn's policy of encouraging patients to help themselves when she refused to make Patient X's bed.  At the time of the incident, "[s]he asked why someone else could not help Patient X."  (Doc. No. 25-1 ¶ 46.)  If she truly thought Elwyn staff were not supposed to make Patient X's bed for him, there is no reason why she asked other staff members to step in for her.  And two days after the incident, Davis emailed Mack with an explanation of the night's events.  (Doc. No. 23-2 at 453.)

She recounted, "Once in the office I told Adam [Moody] what happened.  Adam asked me to make the bed up for Patient X.  I told him that I would not.  I also asked him why he could not ask the two other staff members to assist Patient X.  He then told me I was not fulfilling my job duties and asked me to leave for the night."  (*Id.*)  But Davis makes no mention of the fact that she thought Elwyn practices required her not to make the bed for Patient X.  (*See generally id.*)

Finally, Davis has not presented evidence that she was terminated for any reason other than her refusal to follow her supervisor's directives.  *Willis v. UPMC Children's Hospital of Pittsburgh*, 808 F.3d 638 (3d Cir. 2015) is instructive.  In *Willis*, a nurse claimed that she was terminated on the basis of her age.  *Id.* at 643.  The hospital cited three legitimate, nondiscriminatory reasons for terminating the nurse, including the fact that the nurse had used profanity in a patient's room.  *Id.*  The nurse argued that the hospital's stated reasons were "riddled with inconsistencies such that a reasonable factfinder could find said reasons were pretext for discrimination" because, for instance, there was no evidence that any patients had heard her curse and other nurses regularly used profanity.  *Id.* at 648.  The Third Circuit explained that it did not matter whether anyone heard or whether other nurses cursed because the hospital had a policy barring nurses from using profanity, and the nurse admitted to violating that policy.  *Id.*  Because the nurse failed to point to any evidence that she was terminated for some reason *other* than her violation of the policy (regardless of the fact that she violated the policy in a fairly mild manner), the Third Circuit concluded that a reasonable jury could not find pretext. *Id.* at 648–49; *see also Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 679 (E.D. Pa. 2016) (holding that the plaintiff had not identified "weaknesses" in the defendant's stated reason for terminating her—reported patient abuse—sufficient to establish pretext even though the defendant had not substantiated the alleged abuse before terminating the plaintiff).

So too here.  Davis has not adduced any evidence that she was terminated for any reason

other than her refusal to abide by Moody's directive.  At the pretext stage, it is not the role of the Court to determine whether the employee's termination was the "the best, or even a sound, business decision"—we need only determine whether the "real reason is discrimination."  *Willis*, 808 F.3d at 647.  The record shows that Davis was terminated for disobeying Moody's orders.  Perhaps she was justified in disobeying Moody's orders based on the training, but that does not affect the Court's analysis at this stage.  Davis has not identified any evidence that she was terminated *because she complained about Patient X*, so she has failed to establishing pretext.

\* \* \*

Because Davis has failed to establish that Elwyn's proffered reasons for termination were pretextual, Davis's retaliation claims fail.

## IV.   CONCLUSION

For the reasons above, Elwyn's motion for summary judgment is granted.  An appropriate Order follows.